# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

                            **Case No. 1:20-cr-62**

      **v.**                      **JUDGE DOUGLAS R. COLE**

**JESSE CARTER,**

      **Defendant.**

## OPINION AND ORDER

This cause is before the Court on Defendant Jesse Carter's Motion to Suppress (Doc. 19) and Motion to Dismiss (Doc. 24). The former seeks to exclude, on Fourth Amendment grounds, evidence that law enforcement officers obtained when searching a vehicle that Carter was driving—a vehicle that had been reported stolen. The latter motion argues that the government cannot establish that Carter possessed the firearm described in Count One of the Indictment "in or affecting commerce," which is a necessary element under 18 U.S.C. § 922(g)(1). For reasons described below, the Court **DENIES** both of Carter's Motions.

## BACKGROUND

On March 6, 2020, Cincinnati Police Department ("CPD") officers stopped a black Nissan after witnessing it run a red light. (Tr., Doc. 25, #211). When the officers ran the vehicle's tags, they learned that the vehicle had been reported stolen. (*Id.* at #217). In response, the officers ordered Carter and his passenger to exit the vehicle, handcuffed them both, and then detained them in a police cruiser. (*Id.* at #221–22).

When securing Carter, Officer Fehrman, one of the arresting CPD officers, performed a pat down on him. (*Id.* at #221). During the pat down, the officer discovered two concealed knives on Carter's person, both hidden in his boot. The officer also observed insignia on Carter's clothing that suggested affiliation with the Iron Horseman motorcycle gang.

Once detained, Carter discussed the vehicle's ownership status with Officer Fehrman, who asked if Carter knew the car was stolen or reported stolen. (*Id.*). Carter said no and claimed that he purchased the car from a former girlfriend, had the title at his house, and was in the process of transferring the title to his name (the title, according to Carter, was still in his ex-girlfriend's deceased husband's name). (*Id.*). In addition, Carter stated that he was aware that his ex-girlfriend was "reneging on the deal." (*Id.*). Even so, Carter told the officers that he had paperwork at his house that would attest to his ownership. (*Id.* at #242). Despite Carter's statement and request to be allowed to go to his residence to get that paperwork, the CPD officers did not permit Carter the opportunity to obtain that paperwork or to phone a friend who would bring those documents to the scene. (*Id.*).

While Carter and Officer Fehrman had that discussion, other CPD officers, including Officer Myers, arrived and searched the vehicle's interior without a warrant. (*Id.* at #252). When officers approached the car, its doors were open, making much of the interior visible. The officers observed five knives in plain sight inside the car, three in the back of the car and two in the driver's-side door. (*Id.* at #253–54). These knives "were more of a pocket knife type," were kept in sheaths, and appeared

"dangerous" to Officer Myers. (*Id.* at #254–56). Because it is unusual to see numerous knives scattered in a car, Officer Myers became suspicious that the car would contain contraband. (*Id.* at #256).

After observing the knives, Officer Myers began the search by opening the trunk of the car, which contained a zipped backpack. (*Id.* at #272). Before opening the backpack, Myers opined that he thought the backpack would contain a firearm. (*Id.* at #273). That backpack only contained an "AR15 tool," and not a firearm, but CPD officers continued to search the car. For example, they located a "crack pipe," stored in a case, in an open compartment on the interior of the driver's-side door. (*Id.* at #263). In total, the officers "located assorted narcotics, US currency, a digital scale, ammunition, knives, and a 9mm Taurus pistol, Model PT809C, bearing serial number TEU 02959." (Mot. to Suppress, Doc. 19, #37). Having made that discovery, the officers arrested Carter. They brought state-law charges against him, which resulted in Carter's detention at the Hamilton County Justice Center.

While detained, Carter made a recorded jail-cell call to another member of the Iron Horseman gang. (Tr., Doc. 25, #284). From this recording, the government learned that an item, which Carter referred to as "the big one," remained hidden in the car "behind the sub." (*Id.* at #285). In response, ATF agents tracked down the car Carter drove on the night of his arrest and performed a second search of the car on March 26, 2020. (*Id.* at #286). Carter's ex-girlfriend, who then possessed the car, granted permission for the search. (*Id.* at #287). The ATF agents found a "short barreled AR-style rifle" inside the car's subwoofer. (*Id.* at #289). A federal grand jury

indicted Carter on two charges: (1) unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and (2) illegal possession of a machine gun, in violation of 18 U.S.C. § 922(o).

Carter now moves to exclude the evidence from both searches. As to the first, Carter argues that the government's warrantless search on March 6, 2020, violated his Fourth Amendment rights. And, as to the second, he claims that the March 26, 2020, search would not have happened but-for the earlier unconstitutional search, and thus the evidence found during that search constitutes inadmissible fruit of the poisonous tree.

The government responds by arguing that (1) Carter had no reasonable expectation of privacy in the car during the March 6, 2020, stop because he did not own the vehicle, meaning he lacks standing to raise a Fourth Amendment challenge, and (2) multiple exceptions for warrantless searches, namely the automobile exception, the search incident to arrest exception, and the inventory search exception, all apply on the facts here.

The Court held a hearing on Carter's Motion to Suppress on April 12, 2021. At that hearing, CPD Officers Fehrman, Myers, and Del Raso testified regarding the March 6, 2020, automobile search, and ATF Agent Remick-Cook testified regarding the March 26, 2020, search during which officers found a machine gun in the same automobile. Carter filed a Supplementary Memorandum in support of his Motion to Suppress on May 5, 2021. (Doc. 26). The government filed its Response in Opposition

on May 18, 2021. (Doc. 28). Carter submitted his Reply on May 25, 2021. (Doc. 29). That issue is now fully briefed and ripe for resolution.

Apart from his Motion to Suppress, Carter also asks the Court to dismiss Count One of the Indictment on the grounds that the government cannot show a necessary element under 18 U.S.C. § 922(g)(1), namely that Carter possessed the Taurus pistol "in or affecting commerce." (*See* Mot. to Dismiss, Doc. 24). In short, he argues that merely possessing a firearm manufactured in another state does not satisfy the statute's interstate commerce requirement. The government disagrees. (*See* Resp. in Opp'n, Doc. 27). It claims that so long as a gun is manufactured outside a given state, and later discovered in the possession of a person inside that state, that suffices, in and of itself, to satisfy 18 U.S.C. § 922(g)(1)'s "in or affecting commerce" requirement. This issue is also fully briefed and ripe for resolution.

## LAW AND ANALYSIS

### A. Carter Had An Expectation Of Privacy In The Car Sufficient To Create Standing For A Fourth Amendment Claim.

As a preliminary matter, the government contends that Carter lacks standing to assert the Fourth Amendment here because he lacked a reasonable expectation of privacy as to the car or its contents. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'") (quoting *Katz v. United States*, 389 U.S. 347, 360, (1967)). The government bases this argument on its assertion that Carter was driving a car owned by someone else, coupled with the well-settled proposition that drivers of stolen cars typically lack a reasonable expectation

of privacy in those cars (and the items inside). *Byrd v. United States*, 138 S. Ct. 1518, 1529 (2018) ("No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car."); *cf. United States v. Taylor*, 496 F. Supp. 2d 852, 855 (S.D. Ohio 2006) ("[C]ourts have generally held that the owner of a vehicle has a reasonable expectation of privacy therein."). So the Court begins by asking whether Carter fits the bill as a car thief for Fourth Amendment standing purposes.

First, a few words on the burden of proof. Carter bears the overall burden of showing that the government violated his Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). And in that regard, he also "has the burden of establishing his standing to assert a Fourth Amendment violation." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (finding that defendant had the burden to show his expectation of privacy in a rental car). *See also United States v. Mastromatteo*, 538 F.3d 535, 544 (finding that defendant "failed to carry his burden" concerning the Fourth Amendment "standing question"). "The defendant has the burden of establishing the standing necessary to assert a Fourth Amendment violation by a preponderance of the evidence." *United States v. Shelton*, 384 F. Supp. 3d 916, 922 (M.D. Tenn. 2019).

Here, the government claims that Carter failed to meet that burden, citing Carter's admissions that he (1) had not paid for the car in full, (2) did not possess its

title in his name, and (3) knew about his ex-girlfriend's desire to renege on the deal, as well as her displeasure with Carter driving the car. According to the government, this amounts to Carter admitting that he was driving a stolen car. That argument misses the mark. Far from admitting he stole the vehicle, Carter asserts that he had an enforceable contract to purchase the car, supported by, among other things, partial performance (he had made a down payment and his former girlfriend had voluntarily given him the physical title to the vehicle). In addition, Carter also stated, prior to the search, that he was endeavoring to get the title changed to reflect his recent acquisition, and asked the officers to let him go home and obtain ownership paperwork. Even Officer Fehrman found the situation "confusing" and unclear at the scene. (Tr., Doc. 25, #238). The Court is not convinced that driving a car obtained through a verbal agreement, despite some delay in transferring title and a later attempt by the seller to revoke the deal, is equivalent to stealing a car for Fourth Amendment standing purposes. In other words, Carter articulated a degree of lawful possession in the car, albeit somewhat blurry. And the government points to no evidence contradicting Carter's account. Indeed, the government relies solely on Carter's statements, (*See* Resp. in Opp'n, Doc. 28, #347–48), which, as discussed above, point to Carter owning the car.

Ultimately the standing inquiry turns on "lawful possession." *Byrd*, 138 S. Ct. at 1529. Here it appears that there is a good-faith dispute as to whether Carter lawfully possessed the car when the CPD officers pulled him over. And given that the

government failed to offer evidence refuting Carter's account, the statements relied on by both parties suggest that Carter, more likely than not, owned the car.

What is more, even if Carter's ex-girlfriend had validly terminated the deal, thereby giving rise to some kind of private contractual right to repossess the car, that right would not necessarily extinguish the reasonable expectation of privacy in the vehicle that Carter had under the informal purchase agreement. *See United States v. Bonner*, 393 F. Supp. 3d 1063, 1071 (D. Or. 2019) (finding that a rental car company's "attempt to exercise a private contractual right to repossession[ ] did not overcome [the driver's] reasonable expectation of privacy" in a vehicle rented under a valid rental agreement); *United States v. Henderson*, 241 F.3d 638, 647 (9th Cir. 2000) (holding that a rental car driver had a reasonable expectation of privacy in a car, despite an expired rental agreement, he retained control over the vehicle and the company had not initiated repossession proceedings). In other words, Carter's control over the car pursuant to the purchase agreement supports his reasonable expectation of privacy in the vehicle, regardless of his ex-girlfriend's challenge to that agreement (at least until an "act[ ] of dominion terminate[s] [Carter's] control over the property"). *Henderson*, 241 F.3d at 647.

Thus, the Court finds that Carter has shown by a preponderance of the evidence that he had a reasonable expectation of privacy in the car, and therefore has standing under the Fourth Amendment to bring his Motion to Suppress relating to evidence gathered during the March 6, 2020, search and any fruit-of-the-poisonous-tree evidence later arising from that search.

## B. The Government Conducted Its Warrantless Search Pursuant To A Warrant Exception.

While standing provides Carter the ability to assert a Fourth Amendment challenge, the merits of that challenge are a separate matter. To succeed on the latter, Carter must show that the automobile search violated the Fourth Amendment. Here, the parties agree that the CPD officers searched the vehicle at issue without a supporting warrant. And there is little question that the lack of a warrant can create a Fourth Amendment problem. *See California v. Carney*, 471 U.S. 386, 390 (1985) ("The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer."). But that is not always the case, as there are various exceptions to the warrant requirement. The question here, then, is whether any of those exceptions apply.

That inquiry carries high stakes. Under *Mapp v. Ohio*, 367 U.S. 643, 656 (1961), as a general matter, the exclusionary rule prohibits the government from introducing at trial any evidence secured through an unlawful search. What is more, a different rule, commonly referred to as the "fruit of the poisonous tree" doctrine, bars post-search evidence "derivatively obtain[ed]" from the initial unconstitutional search. *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010). Under those rules, Carter may be able to suppress the narcotics, weapons, and other items that CPD officers discovered in the vehicle if the government conducted an

unconstitutional search, i.e., a warrantless search that does not fall under a warrantless-search exception.

As "[t]he proponent of a motion to suppress," Carter "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Evers*, 669 F.3d 645, 651 (6th Cir. 2012) (quoting *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011)). But, in answering the question of whether he has carried that burden, the Court "must begin 'with the basic rule that searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). And, given that "basic rule," in the context of a warrantless search, it is the government, not the defendant, that bears the burden of showing that an exception to the warrant requirement applies. *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

Here, the government claims that three such exceptions apply: (1) the automobile exception; (2) the search incident to arrest exception; and (3) the inventory search exception. Because the Court's resolution of the first of those exceptions is dispositive here, it does not consider the remaining two.

"Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)

(quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). "Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *Id.* at 647–48 (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998)).[1] The government asserts that exception applies here. More specifically, the government asserts that the CPD officers had probable cause to believe that the vehicle contained evidence of a crime for two reasons: (1) the car was reported as stolen, which gave the officers probable cause to believe it would contain evidence relating to automobile theft; and (2) the knives discovered on Carter's person, coupled with the knives that officers observed in plain view inside the vehicle, gave rise to probable cause that the car would contain illegal contraband

---

[1] The Sixth Circuit has made clear that probable cause is a different, and more exacting, standard than reasonable suspicion. *United States v. Pruitt*, 458 F.3d 477, 484 (6th Cir. 2006) ("[I]t is evident that the Supreme Court does not use the terms probable cause and reasonable belief interchangeably, but rather that it considers reasonable belief to be a less stringent standard than probable cause."). That matters because the automobile exception turns on probable cause (unlike, say, the related warrantless-search exception of search incident to arrest, which relies on the reasonable belief standard). *See United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017). But distinguishing reasonable belief from probable cause proves difficult, given that at least some courts have defined probable cause as a form of "reasonable grounds for belief." *Smith*, 510 F.3d at 647–48. So the Court must square two seemingly contradictory principles: (1) probable cause differs meaningfully from reasonable belief, and (2) probable cause has been defined as a form of reasonable belief. To help prevent conflating the two standards, the Court notes that probable cause also requires a "fair probability that contraband or evidence of a crime will be found in a particular place," *Thornburg*, 136 F.3d at 1074, a definition which avoids defining probable cause as merely a version of reasonable belief. Still, as the Seventh Circuit has noted, the degree of separation between reasonable belief and probable cause, at least in the automobile search context, remains unclear. *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014) ("The Court in *Gant* did not elaborate on the precise relationship between the 'reasonable to believe' standard and probable cause, but the Court's choice of phrasing suggests that the former may be a less demanding standard."). Here, as discussed below, the Court concludes that the CPD officers had ample grounds to believe the automobile Carter was driving contained evidence of a crime under any conceivable understanding of probable cause. Thus the Court refrains from further exploration of the difference, if any, between "probable cause" and "reasonable belief" in this setting.

or evidence of another crime, i.e., weapons used in furtherance of car theft.[2] Let's take them in that order.

Here, neither party disputes that when the CPD officers ran the license plate on the automobile, the system reported that vehicle as stolen. The first question, then, is whether a report that a car was stolen provides probable cause for an officer to assume that it was in fact stolen. The answer to that seems straightforward, at least as a general matter. *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) ("If an officer has reliable information, such as a police report, indicating that the vehicle has been stolen, he thus has probable cause to believe that the driver has committed the crime of either stealing the car or knowingly operating a stolen vehicle."). But remember that, here, Carter provided a detailed account of his possession of the vehicle, under which the vehicle was not stolen, but rather was merely the subject of a contract dispute between him and the former owner. At the end of the day, though, whatever the actual facts regarding his ownership, the Court finds that police officers are entitled to rely on a report that the vehicle was stolen to support their conclusion that the car is, in fact, stolen. After all, most persons who are caught in a criminal act would deny liability for that crime, so Carter's protestations of innocence cannot undo the probable cause that the stolen vehicle report created.

---

[2] The government originally argued that the CPD officers had observed drugs or drug paraphernalia in plain view before they began searching Carter's vehicle. At the hearing, though, as well as in post-hearing briefing, the government conceded that the CPD officers did not find the drugs or drug paraphernalia until after the search began. Thus, the Court does not rely on the drugs or drug paraphernalia the officers located as a basis for establishing probable cause for the initial search.

Probable cause to believe that the vehicle was stolen in turn gives rise to probable cause to believe that the vehicle will contain evidence of that crime, such as ownership papers. *See United States v. Edwards*, 769 F.3d 509, 515 (7th Cir. 2014) (finding probable cause for a search pursuant to the automobile exception because officers "pulled over [defendant] on suspicion of driving a car that had just been reported stolen"). Indeed, the Seventh Circuit in *Edwards* considered a nearly identical scenario to the one here, where police officers arrested a driver on suspicion that his vehicle was stolen, and then searched the car to find evidence of that crime. That court upheld the search, noting that "evidence of a vehicle's ownership is always relevant to the crime of driving a vehicle without the owner's consent, and ownership documents are often kept within a car." *Id.* at 516. Rephrased, a stolen car report provides officers probable cause for suspecting that the car contains evidence of a crime, in turn providing a sufficient basis for a search of the vehicle to locate that evidence.

While *Edwards* is not binding, the Court finds that its holding is persuasive. That is because the Court agrees with the central principle animating that case—a stolen vehicle will often contain evidence illuminating the true owner's identity. That includes not only ownership papers, but also personal effects that vehicle owners may leave in their vehicles. Thus, here, the Court concludes that CPD officers had probable cause to search Carter's car for evidence relating to a potential car theft.

But that still leaves the admittedly thorny question of the *scope* of the permissible search. And that brings us to Carter's principal challenge to the search.

He alleges that the CPD officers did not search his car to find evidence relating to a potential car theft, e.g., ownership documents relating to car theft. Instead, he says, they performed the search to locate contraband, such as guns or drugs.[3] There is at least some evidence to back that up. When Officer Myers approached the car, he opined that he thought the car would have a gun inside the trunk. (Tr., Doc. 25, #273). That differs from the scenario in *Edwards*, where the officers "checked the glove compartment" (which is where ownership papers are typically located) and focused their search on looking for registration documents. *Id.* at 515. In short, Carter posits even if the CPD officers had probable cause to search his car for evidence of car theft, they still lacked probable cause to search his car—and certainly his trunk—for evidence of other crimes. And given Officer Myers' statement, Carter believes the CPD officers focused their search on looking for contraband and not evidence of car theft. Thus, Carter argues that the CPD officers searched his car—or at least his trunk—on grounds unsupported by probable cause.

The Court disagrees with Carter. To start, his reliance on allegations about Myers' actual reasons for the search are misplaced. It is well-settled law that, in assessing a search's validity under the automobile exception, the subjective reasons actually motivating the officer's search do not matter. *Thornburg*, 136 F.3d at 1075

---

[3] Carter makes much of Officer Myers having a "hunch" that the car, and specifically a backpack in the car's trunk, would contain a gun. (Suppl. Mem., Doc. 26, #330). To be sure, an officer does not have sufficient cause to search a vehicle based on a "mere hunch." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006). But given that Officer Myers knew that the car had been reported as stolen, the Court disagrees that Officer Myers searched the car based on a mere hunch as opposed to probable cause that the car would contain evidence of a crime (as explained below). So, the Court rejects Carter's assertion that Officer Myers's reliance on a "hunch" distinguishes this case from *Edwards*.

("In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search."). As the Sixth Circuit recently put it, officers' subjective intent or the reasons they provided for the search are "generally immaterial." *Hernandez v. Boles*, 949 F.3d 251, 257 (6th Cir. 2020) ("Trooper Boles's admission that he was interested in ferreting out crime rather than merely issuing traffic tickets does not alter the Fourth Amendment analysis. It remains the case that an officer's subjective intent is generally immaterial."). Rather, the question is whether an officer in the situation would have had an objectively sufficient basis for conducting the search.

That objective inquiry also controls questions relating to the *scope* of the search. *See United States v. Taylor*, 955 F. Supp. 763, 770 (E.D. Mich. 1997) ("[T]he constitution permits officers to conduct a search the scope of which is commensurate with the facts supporting the existence of probable cause."); *United States v. Thomas*, 434 F. Supp. 3d 576, 585 (W.D. Ky. 2020) (looking to the "specific and articulable facts" that would make it "reasonable to conclude" where evidence would be found in an automobile when determining the scope of a search under the automobile exception). But that is where the question becomes more difficult here. Remember, after a brief glance into the passenger compartment, Officer Myers started his search with the trunk. And it does not strike the Court that the trunk would be the *first*, or most obvious, place for an officer to begin searching for evidence of car theft, particularly in the form of ownership papers. Searching the glovebox or the driver's

side area would seem to make more sense. And if an officer found sufficient evidence relating to the car theft in those areas (i.e., either confirming or disproving the suspected criminal act), then searching the trunk or backseat of the car would be gratuitous.

That being said, the Court also acknowledges that it may be objectively reasonable to conclude that evidence relating to an automobile theft would be located in the trunk of the allegedly stolen vehicle. For example, as noted above, vehicle owners often store (or at least leave) personal effects in their vehicles, including in the trunk. Those personal effects often include information that would help identify an owner (e.g., a briefcase, luggage, tote, or other similar container, or even a golf bag or other sporting equipment, that has a name tag, or other evidence of the owner's identity). Moreover, an objectively reasonable police officer who received a stolen car report could also reasonably believe that the contents of the allegedly stolen vehicle's trunk could contain other types of evidence relating to that crime. For example, the trunk may contain weapons that were used in a carjacking. So, under that theory, officers searching a reportedly stolen car might have a reasonable basis for searching not only the glove box or passenger compartment, but also the vehicle's trunk, for evidence of the theft. What is more, perhaps even the car may "itself constitute[] evidence or an instrumentality of the crime" when officers suspect the defendant used it in connection with a crime, like car theft, meaning that searching the vehicle would violate "no protectible privacy interest of the car's owner or occupants." *United States v. Shye*, 473 F.2d 1061, 1065 (6th Cir. 1973).

Even more broadly, some cases could be read as suggesting that, once properly invoked, the automobile exclusion provides authority to search the entire vehicle, no matter the crime at issue. For example, the Sixth Circuit has observed that "[w]here police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it." *United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993); *see also United States v. Darulis*, No. 93-3154, 1993 WL 264676, at *7 (6th Cir. July 13, 1993) ("Under the 'automobile exception' to the warrant requirement, an officer may conduct a warrantless search of every part of a legitimately stopped vehicle, including the trunk and all containers, if there is probable cause to believe it contains contraband.") (citing *California v. Acevedo*, 500 U.S. 565 (1991)). And the reference to "contraband" appears to be interchangeable with evidence of a crime, at least in the Fourth Amendment context. *See United States v. Donahue*, 764 F.3d 293, 302 (3d Cir. 2014) ("The courts in making Fourth Amendment analyses long have rejected any distinction between 'evidence of a crime' and 'contraband.'") (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967)). That could be read as suggesting that the CPD officers had probable cause to search Carter's car, and containers therein, for evidence of a car theft.

At the same time, though, other cases, admittedly from outside this Circuit, seem to suggest a different approach, at least when considering whether the right to search in a reported-stolen-vehicle case extends to the vehicle's trunk. *See United States v. Jackson*, 415 F.3d 88, 93–94 (D.C. Cir. 2005) ("The officers must have probable cause to believe that documentation demonstrating that the driver was not

authorized to drive the car would be in the trunk; searching the trunk for documentation establishing or confirming that the driver properly possessed the car would not constitute contraband or evidence of a crime as is required under the probable cause standard."); *United States v. Baker*, 221 F.3d 438, 444–45 (3d Cir. 2000) ("[W]e do not think that a mere suspicion that a car might be stolen justifies a search of the trunk of that car: There is little reason to think evidence of the car's rightful owner would be found in the trunk.").

In short, drawing the exact line as to where officers may search, based on a report that a vehicle is stolen, is not a straightforward task. And, if anything, that line-drawing exercise is perhaps even more difficult in cases such as the one here, when the arresting officers admit that additional information that they solicited before initiating the search made the ownership question "confusing." (Tr., Doc. 25, #238).

On balance, for the reasons stated above, the Court is inclined to conclude that an objectively reasonable search based on a report of a stolen vehicle would include the trunk. Still, the Court also acknowledges that the Sixth Circuit has never precisely addressed that issue, and there is at least some case law from other Circuits suggesting that may not be the case.

Even if the Court's view on the scope of a permissible search is wrong, though, that does not change the result here. That is because of yet another exception to the exclusionary rule, referred to as the inevitable discovery doctrine. "[T]he inevitable discovery exception to the exclusionary rule applies when the government can

demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).

Here, for the reasons described above, it is clear that the officers' probable cause to believe that the vehicle was stolen gave rise to probable cause to search—at the very least—the glovebox and the drivers' side area of the vehicle in hopes of locating evidence of that crime. And it is undisputed that when they ultimately did so, they discovered a crack pipe stored in an open compartment in the driver's side-door. (*Id.* at #263). Locating the crack pipe there in turn would have provided an objectively reasonable basis to search the trunk for evidence of additional drugs or drug paraphernalia. *See United States v. Guy*, 1 F. App'x 410, 413 (6th Cir. 2001) (finding that observing drug paraphernalia in a sleeping driver's hands gave probable cause to search the car for additional contraband); *cf. United States v. Galaviz*, 645 F.3d 347, 356–57 (6th Cir. 2011) (holding that observing an "incriminating" handgun in the vehicle gave officers probable cause to search the car's interior for additional contraband).

True, here the CPD officers did not discover that contraband until *after* Officer Myers searched the trunk and the backpack inside. (*Id.*). But given the inevitable discovery rule, the sequence of discovery does not matter. *United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020) ("Although the vehicle search occurred before [the

officer's] discovery of the drugs in [defendant's] waistband, [the officer] inevitably would have discovered the methamphetamine when he arrested [defendant].").

Nor is it any answer to note, as Carter does, that the crack pipe was not in plain view when the CPD officers searched his car, but that instead it was stored in a case in the driver's-side door. (Suppl. Mem., Doc. 26, #325). As already noted, an officer's ability to lawfully search a given area under the automobile exclusion includes the right to search containers located in that area, at least so long as those containers could contain the evidence for which the officer is searching. *See, e.g.*, *United States v. Ross*, 456 U.S. 798, 821–22 (1982). Here, then, where reasonable officers would have had a basis for searching the driver's side area for evidence of car theft, that would include the right to open containers in that area that could contain such evidence. And, as already noted, personal effects, like those that could be located within small containers, fall into that category.

In other words, here, an objectively reasonable search for evidence of car theft ultimately would have led reasonable officers (based on the discovery of the crack pipe) also to search the trunk area of the vehicle for additional drugs or drug paraphernalia. That is enough to salvage the search, even if the officers actually discovered the crack pipe after officers searched the trunk.

All said, the Court finds on the facts here that the CPD officers would have inevitably discovered the contraband in Carter's driver's-side door and thus would have had probable cause to search of the rest of the car (at least in areas that could contain narcotics and related contraband). And because the evidence is admissible

pursuant to the combination of the automobile exclusion and the inevitable discovery doctrine, the Court need not consider whether the government has also shown that other exceptions (e.g., the inventory search exception and the incident to arrest exception) apply here. Additionally, the Court need not consider whether the knives on Carter's person or observed in the car created probable cause because the stolen car report provided an independent, sufficient basis for probable cause to search the car. In sum, the automobile exception, alone or in concert with the inevitable discovery rule, dooms Carter's Fourth Amendment challenge. Thus the Court **DENIES** Carter's Motion to Suppress (Doc. 19).

## C. Carter Possessed A Firearm In Or Affecting Commerce.

Independent of his Fourth Amendment challenge, Carter argues that the government cannot show that Carter possessed the Taurus Pistol described in Count One of the Indictment "in or affecting commerce," as 18 U.S.C. § 922(g)(1) requires. Relatedly, Carter contends that, should the Court conclude that out-of-state manufacture suffices to meet the statutory "in or affecting commerce" requirement, that interpretation would render 18 U.S.C. § 922(g)(1) unconstitutional, as exceeding Congress's Commerce Clause power.

Under 18 U.S.C. § 922(g)(1), a convicted felon can neither "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition" nor "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Carter stresses that the only evidence the government has offered showing that the gun at issue was "in or affecting commerce" is the fact that the firearm was manufactured outside of Ohio (i.e., in another state) and then necessarily entered into the State at some time (as officers ultimately discovered it in Carter's vehicle, which was in Ohio). Rephrased, Carter claims that the government has not proven (and does not intend to prove) that Carter, himself, brought the gun into the State, but rather only that the gun itself came from outside the State to inside the State.

According to Carter, that does not satisfy the statute's interstate commerce requirement for possession. He concedes that the situation would be different if the government had shown that Carter *received* the gun in interstate commerce (i.e., it was sent to him across state lines). But, Carter notes that the commerce language in § 922(g) varies between possessing a firearm and receiving a firearm. As to the former, a felon must not "possess [a firearm] in or affecting commerce." But, as to the latter, a felon must not "receive any firearm of ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). According to Carter, the express use of the phrase "shipped or transported in interstate … commerce" in connection with "receiving," demands that the phrase "in or affecting commerce," which the statute uses in connection with "possessing," means something *other than* merely shipping or transporting. And he claims that this legal question is one of first impression that "[n]either the Supreme Court nor the Sixth Circuit have addressed." (Mot. to Dismiss, Doc. 24, #73).

Separately, but relatedly, Carter argues that "exercising federal jurisdiction over possessors of firearms as proposed in this case would exceed Congress' power under the Commerce Clause." (*Id.* at #85). In other words, the lack of the necessary connection to interstate commerce creates not only a statutory problem, but also a constitutional one, as Congress's power to regulate commerce extends only to *interstate* commerce.

For its part, the government concedes that the firearm's only interstate character is that it was manufactured outside of Ohio and then brought into Ohio. But it asserts that a firearm being manufactured out-of-state is enough to satisfy § 922(g)(1). In addition, the government claims that binding case law bars Carter's motion to dismiss, regardless of whether Carter received, or instead merely possessed, the gun that was manufactured out of state.

The Court agrees with the government. The first problem with Carter's statutory argument is that Sixth Circuit precedent forecloses it, as this Court recently explained in *United States v. Wendel*, No. 1:19-cr-132, 2020 WL 832098, at *1 (S.D. Ohio Feb. 20, 2020), and in *United States v. Chivers*, No. 1:19-cr-119, 2020 WL 4582708, at *1 (S.D. Ohio Aug. 10, 2020). In both *Wendel* and *Chivers*, the Court cited the Sixth Circuit's decision in *United States v. Chesney*, 86 F.3d 564 (6th Cir. 1996), in which that court stated "[t]he Supreme Court has held that proof that a firearm moved in interstate commerce at any time is sufficient to meet the government's burden of proving 'the commerce or affecting commerce' element of § 1202(a), the predecessor to § 922(g)(1)," and thus equally suffices to show that element for the

latter statute. *See Wendel*, 2020 WL 832098, at *1 (citing *Chesney*, 86 F.3d at 571); *Chivers*, 2020 WL 4582708, at *1 (same). Or as the Sixth Circuit put it even more expressly in *Chesney*: "[A defendant's] stipulation that the gun has been transported in interstate commerce [is] sufficient to meet § 922(g)(1)'s 'in or affecting commerce' requirement." 86 F.3d at 572. And all three of these cases involved defendants charged with *possessing* the firearm, not *receiving* it. Given this Court's holdings in *Wendel* and *Chivers*, as well as the Sixth Circuit's decision in *Chesney*, the Court rejects Carter's argument. So long as a gun is manufactured out of state, that suffices, in and of itself, to satisfy 18 U.S.C. § 922(g)(1)'s interstate commerce provision.

That leaves Carter's Commerce Clause argument. But *Chesney* provides an answer to that as well: "*Lopez* also did not disturb the Supreme Court's precedents which indicate *that a firearm that has been transported at any time in interstate commerce has a sufficient effect on commerce* to allow Congress to regulate the possession of that firearm pursuant to its Commerce Clause powers." 86 F.3d at 570–71 (emphasis added). *See also United States v. Rashid*, 483 F. Supp. 3d 529, 531–32 (S.D. Ohio 2020) (rejecting argument that applying § 922(g)(1) based on out-of-state manufacture violates Commerce Clause); *United States v. Warren*, No. 1:18-CR-84, 2021 WL 617384, at *1 (S.D. Ohio Feb. 17, 2021) (same); *Wendel*, 2020 WL 832098, at *1 (same).

In short, binding precedent compels the Court to reject both Carter's statutory and constitutional arguments. Accordingly, the Court **DENIES** Carter's Motion to Dismiss (Doc. 24).

## CONCLUSION

Based on the foregoing, the Court **DENIES** Carter's Motion to Suppress Evidence (Doc. 19) and Motion to Dismiss (Doc. 24).

**SO ORDERED.**

June 24, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**